If it pleases the Court, I'm Jason Bach on behalf of the Appellants Board and the individual appellants Carl Snowden, Maverick Snowden, and Suzanne Snowden. The appellants brought this case in the District Court in an attempt to end a systemic culture and pattern of favoritism in a rural county government in Nevada. The crux of their argument, the main cause of action that they have alleged in this case is an equal protection claim. The District Court dismissed that claim of ceremony judgment on the basis that the plaintiffs had not presented evidence raising an issue of fact that these properties were similarly situated. There were no other findings of fact or conclusions of law that dealt with this issue other than that statement. So, to begin, I'd like to address similarly situated and what that means and how it applies to this specific case. What Justice White determined in Williams v. Vermont in 1985 was that similarly situated is applied for all relevant purposes. What the county would like to argue and what they have been arguing is that similarly situated means essentially identical. And in this particular case, identical is not similarly situated. The county has argued that because these commercial properties all had different zonings, because they were different types of businesses, that they were not similarly situated to the appellant's commercial property. When in reality, the ordinances that affect impact fees, septic tanks, parking, landscape buffers, are all the same for all commercial properties regardless of all of these other factors that the county has tried to use to differentiate between the appellant's commercial property and the other commercial properties that are in the county. The type of business is essentially irrelevant when there's a statute or an ordinance that affects every commercial property within that county. However, the district court accepted that argument and relied upon a certain affidavit that was attached to the reply saying, well, these commercial properties that you're comparing your client's commercial properties to are different because they have different zoning. You're comparing your client's furniture store or a retail complex to a car wash and how could that be similarly situated when in reality the ordinances are the same? And I believe that we have established that in our briefs. So what we get to with the equal protection claim is that once we have established that these commercial properties are similarly situated, we have established by the evidence and there are... Counselor, I'll get right to the point as to what my concern is. I reread your brief this morning. I read it before. I looked through all 10 or 11 volumes. It's a huge record in this case. And in your brief, the evidence that you supplied for the disparities between the way that your clients were treated and the way that other property owners in Pahrump were treated was all based on the Snowden's affidavits. And I read the two Snowden's affidavits and I didn't see any evidence in there. Okay. I also saw that you referred to two places in the record, 1093 and 1095. Those are architectural drawings of some kind I can't make hide or hair of. I have no clue what the problem is here. And the fact is that if your clients are being asked by the county to do something, for example, to put in a septic tank that somebody else wasn't required to put in, you know, unless I've really got an explanation, a full explanation as to what the problem is between your clients and a very specific piece of property, I don't see the equal protection problem. So maybe you want to get some details here. Sure. And what we established in our briefs as we did in the lower court is that whether it's a septic tank issue, impact fee issue, landscape buffer issue, we've gone through and identified what those properties are. Then in identifying what those properties are in the record, we've identified the public records that we have obtained showing that... But telling me that somebody didn't have to have as many parking spaces as you were required to have for your property isn't telling me that they're similarly situated just because they're commercial properties and just because they're subject to the same ordinance. The fact of the matter is that retail establishments are not all the same. Okay. But when we're dealing with impact fees, for example, there's a specific ordinance and statute that dictate how much those impact fees are. And so when we have the county that is strictly construing that ordinance towards our clients and saying that you must pay this, but then we're going and looking at the record of what they're doing with other commercial properties at the same ordinance, the same statute applies to, and they're not holding them to the same standard. Either A, not requiring them to pay any impact fees whatsoever, or B, not requiring them to pay impact fees until the entire property is completely built. Both of those things are things that my clients had asked for and that they were denied. And we have established in the record what those properties were. We have attached them. The public documents that reflect what impact fees were paid, when they were paid, or whether they were paid. Okay. But in addition to that, the district court held that we did not meet our evidentiary burden of being able to establish that our clients were treated any differently. In addressing the evidentiary issues, one, we need to point out that there was a motion for protective order that was granted in this particular case dealing with two of the individual defendants in the case. Part of our allegations in this is that there were two individuals within the county government that were essentially spearheading this retaliation, if you will, against our clients and treating them differently than other people. Throughout the course of discovery, we learned that one of these individuals has been terminated from two prior government entities that he worked for before he worked for Nye County. We have, in addition to our civil rights claims, we have a negligent hiring and training supervision claim in there. And we wanted to obtain those records from his previous employers to see, one, why was he terminated? And two, obtain the records from Nye County to see, did Nye County look at those records before they hired him? Did they conduct any investigation before they hired him? And we were denied that. In addition to that, perhaps the most disturbing revelation that's coming about as far as the evidence in this case is that in January 2012, after this case was already up on appeal, it's revealed in the media that one of the appellees, one of the defendants, filed a complaint in 2010 during the discovery of this case alleging that Nye County is illegally favoriting certain contractors in Nye County. He makes this complaint to the district attorney's office in 2010, less than one week after we deposed him in this case, he's making the same allegations about Nye County that we're making about Nye County. And that information was never produced. That information never came to light during the discovery of this case. This is all after your brief, so this is not even in your brief. There's a brief reference to it in the introduction of the reply brief because it was in between the answering brief and the reply brief that all of this came to light. But this is a newspaper article. This is a newspaper article, however, then additional documents were provided to us, which we attempted to supplement the extradited record on. What can we do with this at this point? Well, what you can do on that point is allow the matter to be remanded back to the district court to reconsider that information that wasn't... Who was the witness? Richard Johnson, who was one of the defendants in this case. There was a motion to amend or to expand our extradited record early on in the briefing that was denied on that issue. But remanding it back to the district court, in my opinion, would be the appropriate remedy to allow the district court to consider that information that was not produced during the course of discovery. What the district court did rely upon when they made their decision was this affidavit called the Matrix, I believe, in the reply to the defendant's motion for summary judgment. And what this affidavit is, it's an affidavit from a relatively new county employee who is supposedly based on personal information, providing information about each of these properties that we included in our brief, saying these are people that are being treated differently than our clients, more favourable than our clients. They provide this affidavit supposedly based on personal knowledge, when in reality that individual was not working in that capacity during the time that these commercial property owners were being treated more favourably than our clients. And there's a number of errors, there's a number of inaccuracies that we probably weren't provided an opportunity to respond to at the district court level, considering it was only provided at the time of the reply. You will see in our briefing that we address those inaccuracies, we go through those and explain why it is that their explanations for why those properties have not been treated more favourably or are not similarly situated is simply inaccurate. In dealing with the issue of the Monell claim, the district court ruled that the appellants had not established that any of the defendants in the case were policy makers. And that it was the actions of the policy makers that resulted in any deprivation of liberty of the appellants. We believe that we have established that. In fact, in the record there is a memo from Defendant Johnson from May 13, 2009, in which he states that he is the final authority in dealing with subjects, and that's an exterior record 1272. There are the depositions of Floyd and Lanza that are in the record that establish that they believe that Defendants Loman and Johnson were the policy makers. Finally, and perhaps even most importantly, Defendants Loman and Johnson communicated to the appellants that they were the final authority makers, even encouraging them not to appeal certain matters. The district court ruled that the takings clause, or the claim related to the takings clause, should be dismissed because the plaintiffs did not exhaust all of their state remedies prior to bringing the claim at district court. The U.S. Supreme Court, in the first English case in 1987, Chief Justice Rehnquist ruled that even a temporary taking of a property is actionable even when it's only temporary. A year later, the 11th Circuit, in interpreting that case, in a case very similar to ours, stated that even a temporary taking is actionable when the actions of the local government creates a situation where the commercial property owner is unable to open that property and is ultimately foreclosed upon. And essentially, that is similar to what is happening here with our clients. They were never able to complete their property. As far as I know, it's still sitting there as a shell. They had to release some or all of their ownership in that property in order to survive. Their investment is essentially down the tubes at this particular point. The other causes of action in the case deal with due process, which the substantive due process claim here is very closely related to our equal protection claim as far as whether or not the actions on behalf of the defendants was arbitrary and capricious. Did they have a rational basis whatsoever to treat our clients one way and to favor other commercial property owners in a different way? You know, one of the factual bombshells, if you will, in this case, deal with an investigation that we did where essentially we hired a private investigator. My clients hired a private investigator to approach some of the defendants and essentially pretend like they're... This is the Brent Steed? The Brent Steed and the Alexei Jackson, who is the private investigator, saying, hey, we're interested in trying to purchase this property. Is there any reason here why we should not purchase this property? And I think it shows the true colours of really what's going on here and the mindset of these people, what's going on here, and the mindset of these people is really important here, because it seems far-fetched for many to believe that there could be this vast conspiracy of people who simply are out to get... I wasn't impressed by it, so... OK, well, what he was saying was, you know, don't buy that. He's suing everyone. You don't have a septic. You have to pay $50,000 to $60,000 to get a septic, which is a gross exaggeration. You would have to pay impact fees, which was completely inaccurate because our clients had already paid impact fees. And you want to go see the Wolfensteins. They'll help you out. They'll find you a property. Now, coincidentally, the Wolfensteins are one of the larger power brokers, if you will, within Nye County, and when you look at the list of properties that are receiving favourable treatment, their properties are included on there. So... Your clients have already paid the impact fees? They had already paid the impact fees. That's $37,000? $31,000, I believe. OK, and the septic was already installed? The septic was not already installed. Has the septic been approved by the state? The septic was initially approved by the county. The septic was never approved, to our knowledge, by the state. They did not install... Isn't it the state that has the final say on the septic tanks? Not with this septic tank. Because on this particular septic tank, because of its size, they designate their authority to Nye County. So it would actually be Brent Steed's department within Nye County that would have the final say on that. So, you know, but what he did with the septic was he took a $15,000 septic tank and told the investigator you'd have to spend $30,000 to $50,000 to put in a septic tank. It just shows the mindset that these people did essentially anything and everything they could to prevent my clients from building this property when other people were given more preferential treatment. I would like to reserve the rest of my time if I may. OK, thank you. May it please the court. Rebecca Brew from Erickson, Thorpe & Swainston in Reno, Nevada on behalf of the Nye County defendants, along with Jack Lowman and Richard Johnson. I would like to... I have a co-counsel who represents Mr. Steed and Mr. Floyd and I would like to reserve about... I think he's asked for about 6 minutes. I'm thinking I'm only going to take about 10 minutes of your time. I am... I go to the district court conferences and I'm a Ninth Circuit rep and I'm very mindful whenever I hear a judge up there talking about please, please, counsel, keep your briefs as brief as possible and I'm always certain that it's me that they're using as an example of that dreaded brief that's sitting there on their desk with 100 exhibits and many, many pages. I was reminded of that again as I was reviewing, preparing for this today that what took me in my summary judgment motion about 90 pages or 65 pages and hundreds of pages of exhibits, Judge Proe, in 6.5 pages, was able to get to the point on these issues. The heart of this issue, I think, of this case, is the equal protection claim and the similarly situated. And so I would like to address particularly what Mr. Bach has raised about the matrix that was prepared by Mr. Osborne. It was not through... The stones were deposed over several, several days and they were given lots of opportunities to provide with me, tell me what evidence you have that others similarly situated have been treated differently. And throughout the course of that, there was just very vague references to an address with nothing in particular. It wasn't until I wrote my motion for summary judgment and then Mr... and then the stones prepared their opposition that all of a sudden we have 28 properties that are identified that they with specificity are saying these folks are all similarly situated and you have treated us... you have treated us unfairly and not the same as those other folks. So while the stones complain that they disagree and they didn't have an opportunity to look at those explanations that we provided, that's because they didn't identify them until the opposition to the summary judgment. So once we got that, then I...imagine my surprise and now I've got to set to work to try and look at those issues. And so that's what we did with Mr. Osborne's assistant. Mr. Osborne was the new planning director and he was the new planning director but he had been working throughout the...the appendency, if I recall correctly, throughout the appendency, had been a pretty long-term employee of Nye County. So he was familiar with that process specifically. So he was able to go through and once those were identified we then were able to point out why each of those were not similarly situated and that's how the Osborne matrix was born because...and the affidavit so that we could finally respond. The idea that Mr. Osborne... the idea of remanding this back to be able to do that is too little too late. Mr....the Snowden's had their opportunity throughout the course of all of this. They were on a fishing expedition. They did not like the idea that they had to comply with the same rules and regulations as everybody else. I would submit to you that not only were they treated equally but they... what they were requesting was preferential treatment. They wanted to do what others did not. Granted, the Snowden's Mr. Bach is correct. There's no two properties that are going to be identical. Hence, that's why there are different zoning requirements. That's why there's discretion involved. That's why there's an opportunity to appeal and to... and every single one of the site development plans and responses that were given back to the Snowden's were...they were told they had a right to an appeal or request a waiver and they never did any of that. What they did was continue on and on and hammer on and on to try and have to...try and get around the requirements of what I submit was an underfunded project from the beginning. Any of the... there were any of the delays that they complained about when you take a look at the timeline that is laid out in the brief you can see that well within all of those timelines that were allowed for responding back the county was within all of those timelines none of them were...did they go over and in fact some of them were turned around in a day or two. The only delays that there were were caused by the Snowden's and their failure to provide timely responses back to the county. There were no new requirements that were ever put on them in each one of those site development plans and I it's amazing I learned everything that I never wanted to know about ISDS and OSDS septic systems and things that we get to learn in these situations but I was astounded at that site development plans in the beginning of what little there was that they were asked to do. They were asked to correct some spelling errors. They were asked to...they needed to pay the appropriate fees. They make much about this septic system and how they thought that they were because they had a building permit that that meant that they didn't...that that approved the septic system. It was clear on every one of those documents that a building permit is not a permit for a septic system. They never were able to provide a permit. There was never one issued by the state or by...in the beginning we suspect that the...is the septic system now in? As far as I know, no. It is not in. Okay. So it hasn't been approved by the county because Mr. Bach represented that it was it had been approved by the county. You know Mr. Steed misrepresented this. Well I think and Mr. Kilburg can talk to Mr. Steed but I think that what happened is that after the fact throughout the course of this litigation I think at some point finally the students determined that they would go ahead and put in the septic system and I think that they applied for a permit and I think a permit may have been granted but it was never put in. Mr. Bach said that some people are not forced to pay the impact fees and that others can delay the payment of the impact fees until after the project is completed that his clients had to pay the fees up front. I'm not aware of anyone, when I ask my client about this, I'm not aware of anyone who was not required to pay their impact fees at the same time as the students. So far as you know, the impact fees have to be paid up front and they don't get waived. Yes. And I will... Is there anything in the record to the contrary? Not that I'm aware of. I also will tell you that because of where all of this has gone, at some point, the county has offered to refund the impact fees to the Snowdens because of the project as it sits. And that's what I've been told by my clients. Have they conveyed that to the Snowdens? As far as I know, they have, yes. As far as the Monell claim, as Judge Pro pointed out, there is no identified practice here, pattern or practice of something that would rise to the level of a Monell type claim. And as this court is fully aware, let's just assume, arguendo, that there was some improper conduct by Mr. Lohman or Mr. Johnson, that doesn't create a Monell claim. Individual tort fees cannot create a Monell claim. I want to briefly respond to what Mr. Bach talked about with the late breaking news about supposedly Mr. Johnson's whatever was in the newspaper article. First of all, I would represent to the court that those issues have nothing absolutely nothing to do with the Snowdens issues. But let's just assume for the fact, for the sake of our conversation here today, let's assume that there was something to what Mr. Johnson said. That has nothing to do with the Snowdens. There is not a they cannot support their burden of proof. There are no similarly not a single similarly situated property here. There was no appeal so that there is no substantive due process or procedural due process violation here. There was no takings because Mr. Bach wants to talk to you about a temporary taking. It has to be a taking whether it is temporary or permanent. All the Snowdens they were not told they couldn't have permits for any of this. They were not told they couldn't build their project. All they were told is that you have to comply with the rules. You have to do the same as everyone else. You don't get special treatment. They could have appealed on the takings also and they never did any of that. All they were told is that you have to get your permits. The fact that they don't like that doesn't create violations of constitutional proportions and as the courts have pointed out and as I pointed out in my brief that's exactly what in the Supreme Court and my mind just went blank for the Supreme Court the name of the case you are not the courts do not want to sit as zoning boards and go through and look at and rethink all of this stuff but it would have had to have been appealed in the first place for you to even get there they don't want to do any of that what they want to do is circumvent all of their requirements not provide any evidence that anybody has been treated. Anybody who is similarly situated has been treated differently here as an example on the impact fees because they raise that there are different people who pay different impact fees because there's different impacts. For instance as I pointed out in my brief there's a shell of a building that person who owns the shell of the building pays a different impact fee than someone who is going to build a retail store or a furniture store that's all built out. Then when the individual is in a shopping mall or a subdivided building then when they go to open their own individual business then they pay additional impact fees depending on the impact that they're going to have on the community and that's how they're determined. So no, everybody doesn't pay the same impact fee because they don't have the same impact and that's how a determination is made. So I want to unless you have any other questions for me I want to reserve some time for Mr. Kilbur. Thank you. Good morning your honors. My name is Jeremy Kilbur. I represent Brent Steed, Jimmy Floyd and Charles Abbott and Associates. For convenience I'm going to collectively refer to these appellants as Charles Abbott. Knight County has done a good job arguing regarding the constitutional issues. I'd like to take a brief moment to address the immunity issues. In our motion for summary judgment we raised substantively an issue regarding immunity and the discretionary acts taken by Charles Abbott. As employees of the county the Charles Abbott employees are entitled to discretionary act immunity as they're interpreting statute and code and applying it to those Did the district court enter findings on this? Did the district court make any conclusions on this? Your honor, they granted our motion for summary judgment. As part of granting the motion for summary judgment the relief we sought was that the immunity be given to these individuals. The court made a determination of the constitutional issues which is one of the preconditions for finding whether immunity applies. The court determined that there were no constitutional violations. So there was no reason for you to get to the question of immunity. That's correct. He actually didn't rule on the question of immunity, he only ruled on the substantive equal protection claims. Your honor, to get they have immunity to the extent there's no constitutional violation. If we were to he didn't rule in the alternative, right? No. So if we were to agree with Mr. Bach that there's an equal protection violation here we would actually send this back down to the district court for further proceedings including further proceedings on your motion for immunity, wouldn't we? We would have to have a determination at that point whether the actions of the Charles Abbott individuals violated the constitution. The immunity question really isn't before us today, is it? That's a great question your honor because that wasn't appealed. The issue was before the court, the court granted in total the summary judgment. Right, right. But if they granted it on the grounds that there was no equal protection violation, then it didn't decide the question of whether your clients would be entitled to immunity even assuming that there was an equal protection violation. But your honor, I would argue that to the extent the court granted in its totality the motion for summary judgment the fact they didn't make a specific finding regarding immunity is inconsequential. The court granted in total the motion for summary judgment which asked for the relief of immunity and in so doing they adopted what was in our motion for summary judgment in granting the court did not make an exception finding we don't need to reach the issue of immunity the court found your summary judgment is granted and they found that it was granted because there's no constitutional violation. So that issue is not on appeal. It never was brought up in any moving papers there was no response to it even in the opposition to the motion for summary judgment which in and of itself under the local rules in the district court of Nevada, which is local rule 7.2 subsection D, states if there's no opposition made to the argument in the motion it's deemed granted at that point when there was no opposition at the local level our motion for summary judgment was granted on that issue. It was consent that the arguments were valid and the court granting our motion for summary judgment included that as part of its order. In our conclusion it's our position there was no opposition to our motion for summary judgment the Snowden's didn't appeal the motion for summary judgment on the immunity issue there's been no constitutional violations the court did an extensive we had a hearing on it the issues were fully briefed there was oral argument at the district court level there's been no clearly established rights violated these people have been given the opportunity that everyone else is to submit their plans to have a plan review to have comments on the plans if there were any problems with the plans that they didn't agree with they had an opportunity to appeal they chose not to instead the Snowden's continue to try to get favoritism through threats and coercion of litigation and that's the purpose of having immunity for state actors is to prevent those sorts of seeking favor by threatening litigation and this having immunity allows the individuals at Charles Abbott to go and look at the plans and to look to make sure they're properly submitted there is one issue about the septic tank and I want to give you a little bit of history on that when the Snowden's bought the property there was a septic tank already installed there's nothing in the record showing that the Snowden's did any due diligence to determine that the septic tank that was already installed was permitted after they purchased the property and they went and submitted their plans it was determined that they needed a certain kind of septic system, in this case an OSDS system which is more of a commercial type septic system they thought they would be grandfathered in because there was a permitted system an extensive record search was done regarding the permitting of this existing system there was nothing, it was never permitted it's our understanding that it was probably put in in the middle of the night by the people who sold the property and the Snowden's bought off of, they wanted to ensure that they were getting a property with the proper septic system, they had the opportunity to determine the permitting prior to even purchasing the property they chose not to as a result the changes in the coding does not allow for them to be grandfathered in had they properly been permitted under the ISDS system when the new OSDS system came into play they could have been grandfathered in however, they're not because they didn't have the proper permitting to start your honor, we submit that Charles Avenue Associates exercises discretion that they're entitled to as agents of the state there's been no constitutional violations, we believe any immunity that's found should be extended to Nye County and their employees as well thank you Mr. Bach Judge Bybee, you had asked Ms. Brew if there were any examples in the record of commercial properties that were required to not pay impact fees pay lower impact fees or delay payment of impact fees and the answer is absolutely yes in the opening brief on page 13 we list the properties on Mesquite, on Frontage Road on Calvada, on Highway 160, we cite to the record of the documents that were attached on the opposition to motion when were these things filed? I think that's what she said she didn't say they weren't there, she said they weren't there at a certain time, isn't that what she said? they were there attached to our opposition to motion for summary judgment, is that what you're referring to? Yes, they were absolutely attached, in fact the citation to the record in our opening brief is citing to our opposition to our motion for summary judgment so these are all documents that were presented to the district court on each of these issues, it's not just impact fees it's site development plans, it's parking regulations. Counselor, here's part of the problem I don't have, I'm not sure I have the volume for all of this, but for the properties, for several of the properties that you've listed, the Calvada property and the Homestead property, 460 4651 Homestead property, the citation there is to the Snowden's affidavits, that's not evidence I've read those affidavits, that is not going to be acceptable proof Ok, right, and there are some that there were simply no records in the file for, and this is one of the ways that these people circumvented pain and impact fees Ok, now I'm looking at the first one that you've got, which was, this is the Mesquite property at 1035 and it says no impact fees required, it's an existing church it had a new multipurpose building does Nye County always issue impact fees on churches? Yes the impact fees apply to any non-residential property, whether it's government owned, whether it's a church, whether it's a strictly for-profit property, and that not only applies when you're building new construction but it also applies when you are making major renovations or you're expanding as well. What I think your opponent said was sure you pay impact fees but they differ, they differ based on what the impact will be so would a church would a church have an impact and have to pay a fee? Yes the church would have to pay impact fees and Ms. Brew is absolutely correct what the statute provides, what the ordinance provides is it says if you're going to have this type of business you're going to have this type of impact and this type of impact fee, if you're going to have this type of business etc. etc. and what we're saying is that does not apply. Did you depose anybody at Nye County about this property? About that particular property? During the course of those depositions I do not know if that particular property was asked about, there were other properties that were asked about such as the UPS facility for example. Okay well you've given us citations to three things you gave me the Mesquite, you gave me a South Frontage property and the 4651 Homestead I'm sorry not the 4651 the South Highway property and I have those applications sitting in front of me now did you ask anybody at Nye County about that for an explanation? No because most of these properties were obtained in this case many of these records came very late in the case, for example but the fact that you've got somebody, for example the fees on one of these is $47 I have no idea what you get for $47 but it doesn't sound like very much so I have no idea that they're similarly situated, how can I possibly tell that on this record? Well there is another piece of property which is in the reply brief on page 4 which is the 2101 East Gamebird property and what that property this was a property where they were not required to pay impact fees because what the county did was they said that the date of the impact fees begins on I believe it was September of 05 and because this individual, this commercial property owner had expressed interest prior to September of 05 when they eventually applied for their building permit which is the time according to the ordinance when the impact fee is supposed to be paid they said well because you expressed an interest a year ago we're just going to simply waive those impact fees for you whereas around the same time is when my clients are looking to develop their property and are not being afforded the same rights and privileges. Where in the record is that building building the permit application? That is extra record page 574. I'd like to ask you a more general question Judge Pro is a very experienced judge and a very fair judge why do you think he went astray? Well I don't know why Judge Pro and I'm not going to use the word go astray but I do find it a bit bewildering to me that with the number over 1500 pages of exhibits over 155 pages of briefing the very last line of the transcript from the oral argument on this matter Judge Pro says I have a lot here it's going to take me some time to go through this I'll do it as fast as I can. The very next day we get an order granting summary judgment on every cause of action with no specificity really other than citing to the one affidavit from Mr. Osborne so to be honest with you I'm quite bewildered by it. That is surprising I know I'm out of time if there are any additional questions I will submit okay thank you. We thank counsel for the argument and that concludes the oral argument calendar for today the court is adjourned the court is adjourned
judges: Farris, Noonan, Bybee